U.S. COURTS

MAY 14 1998

REC'D _____ FILED
CAMERON S. BURKE
CLERK   IDAHO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STATE OF IDAHO,<br><br>    Plaintiff,<br><br>vs.<br><br>LON T. HORIUCHI,<br><br>    Defendant. | Case No. CR 97-097-N-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

  Pending before the Court in the above-entitled matter are a number of motions filed by the parties as well as by non-parties. The Court heard oral argument on March 13, 1998, on Defendant Lon Horiuchi's Motion to Dismiss Based on Immunity Under the Supremacy Clause of the United States Constitution (Docket No. 31) and the State of Idaho's (hereinafter the "State") Motion to Disallow the Defense of [Qualified] Immunity (Docket No. 33). The Court requested, by written order, an official copy of the state court's file in this matter on March 16, 1998. The Court has received and reviewed the state court file as

**ORDER** - Page 1
98ORDERS\HORIUCH.DIS

well as the transcript and exhibits from the Preliminary Hearing.[1] The Court is now prepared to rule upon the pending motions.

## FACTUAL BACKGROUND

Defendant Lon Horiuchi has been charged by Information with Involuntary Manslaughter, a violation of Idaho Code § 18-4006(2).[2] Specifically, it is alleged by the State that on or about August 22, 1992, the Defendant "did unlawfully, but without malice, kill Vicki J. Weaver, a human being, in the operation of a firearm in a reckless, careless or negligent manner, to wit: discharging the firearm through the front door of the Weaver residence in an attempt to shoot Kevin Harris as he entered the door from outside, without first determining whether any person other than his intended target was present on the other side of the door, . . . ." The Defendant has entered a plea of Not Guilty to the charges.

---

[1]The Court notes that there is not an "official" written transcript of the Preliminary Hearing conducted by the Honorable Quentin F. Harden on December 12, 1997. However, the Court did receive a copy of the "unofficial" transcript of the Preliminary Hearing which has been referenced to by the State and the Defendant. The Court notes that neither of the parties have objected to any portions of the transcript as being inaccurate. The "unofficial" transcript is attached as Exhibit A of Defendant's Supplemental Memorandum of Points and Authorities Regarding Proof Required at Preliminary Hearing. The transcript includes the testimony of Sara Weaver, Randy Weaver, Dr. George Lindholm, Greg Sprungl, and Rick Alonzo. The transcript also indicates that the entire trial testimony of Lon Horiuchi in United States v. Randall C. Weaver and Kevin L. Harris, Criminal Case No. 92-080-N-EJL, was admitted by Judge Harden. A copy of Mr. Horiuchi's testimony is attached as Exhibit B of the Defendant's Memorandum of Points and Authorities in Support of Defendant Horiuchi's Motion to Dismiss Based on Immunity Under the Supremacy Clause of the United States Constitution (Docket No. 32).
The Preliminary Hearing Transcript will be referenced as "PH Tr." at page number. Mr. Horiuchi's trial testimony in United States v. Weaver will be referenced as "WTT Tr." at page number.

[2]See, Information which was filed in state court on January 7, 1998. Such information was filed after state Magistrate Judge Harden issued his Order Holding Defendant to Answer to the charges presented in the Criminal Complaint dated August 20, 1998. Certified copies of these state court filings are attached to the minutes of the Defendant's arraignment in Federal Court on January 15, 1998 (Docket No. 25).

**ORDER** - Page 2
98ORDERS\HORIUCH.DIS

Mr. Horiuchi, is a highly trained sniper observer/team leader for the FBI Hostage Rescue Team ("HRT") at Quantico, Virginia. (WTT Tr. at 3.) Along with other members of the HRT, he was dispatched under orders from his supervisor to a crisis site at Caribou Ridge,[3] in Idaho on August 21, 1992. (WTT Tr. at 6.) Roger Wheeler declares that Mr. Horiuchi was acting within the scope of his employment with the FBI's HRT when he fired the shots at issue in this case. See, Declaration of Roger H. Wheeler attached as Exhibit A to Defendant's Memorandum of Points and Authorities in Support of Defendant Horiuchi's Motion to Dismiss Based on Immunity Under the Supremacy Clause of the United States Constitution (Docket No. 32)

Upon arrival, the HRT members were given certain briefings. According to Mr. Horiuchi's trial testimony, the briefings included among other things that a federal Marshal had been shot and killed (WTT Tr. at 35, 153); that in the initial briefing, other federal officers with the Marshal who had been killed were believed to be pinned down by gun fire (WTT Tr. at 250); that the shooting of the Marshal was believed to be a wrongful shooting (WTT Tr. at 154-155); that the parties believed to be responsible were alleged to be connected in some way to the white separatists (WTT Tr. at 187); that Randy Weaver had Special Forces training (WTT Tr. at 185); that the individuals in the cabin had a habit of coming out of the cabin armed[4] (WTT Tr. at 188); that Mr. Weaver may have called in or had assistance from other individuals either living in the area or from outside the area moving into the location (WTT Tr. at 17); that the Marshals had been unable to effect an arrest of Mr. Randy Weaver for an alleged firearm violation (WTT Tr. at 184-185); that Randy Weaver had no prior criminal record (WTT Tr. at 184-185); that Vicki Weaver may have been involved in the killing of Deputy Marshal Degan (WTT Tr. at 183-184); that the decision had been made that any team members going up the hill towards the cabin were in danger (WTT

---

[3] Also known since these tragic incidents occurred as Ruby Ridge.

[4] This fact was confirmed by the Preliminary Hearing Testimony of Mr. Weaver and Sara Weaver.

Tr. at 159) and that the final rules of engagement[5] in effect at the time of shooting of Vicki Weaver directed that only armed adult males were to be shot, if the shot could be taken without a child being injured.[6] (WTT Tr. at 172.) That the orders were final leaving only some discretion as to how the HRT members' duties were to be carried out. (WTT Tr. at 10-11.)

As conceded by the State at oral argument on the Defendant's motion, the HRT members were not aware that Sammy Weaver had been shot and killed on August 21, 1992. Nor did the HRT members know that Sammy Weaver's body had been placed in the birthing shed.

Late in the afternoon on August 22, 1992, Mr. Horiuchi and eleven other federal officers were deployed to what was described as the crisis area around the Weaver cabin (WTT Tr. at 25). Four different positions were taken up by various HRT members to gather intelligence and watch for any hostile action coming out of the Weaver cabin. (WTT Tr. 25-26.) The weather was rainy and cold. (WTT Tr. 25.)

At approximately 5:30 p.m., Mr. Horiuchi and his sniper partner, Special Agent Dale Monroe, had reached and established their position north of the cabin and parallel to the front of the residence. (WTT Tr. at 55, 56.) At approximately 5:45 p.m. or 5:50 p.m., Mr. Horiuchi, heard the Weaver's dog barking and then saw a young female come outside the cabin via the front door and run toward the rock outcropping. (WTT Tr. at 56-57.) Mr. Horiuchi could not determine if the female was armed and the female did not take any action threatening the HRT members. (WTT Tr. at 57-58.) The young female returned to the cabin and went back inside the cabin after approximately 2 or 3 minutes. (WTT Tr. at 62.) Right

---

[5]The initial rules of engagement were that any armed adult could be shot at if they came out of the cabin (prior to an announcement that the FBI was here to arrest them), if the shot could be taken without injuring any of the children. WTT Tr. at 8. The initial rules of engagement were modified so that only armed male adults were to be shot, if the shot could be taken without a child being injured. (WTT Tr. at 9-10, 172-173.)

[6]The Court, with its ruling on the immunity defense of Mr. Horiuchi, is specifically not deciding if as a matter of law the Rules of Engagement determined by Mr. Horiuchi's supervisors and others were proper and lawful.

**ORDER** - Page 4
98ORDERS\HORIUCH.DIS

after the female went back inside the front door of the cabin, a male came out the back deck of the cabin and appeared to be checking on some ponchos or blankets and then went back inside the cabin. (WTT Tr. at 63-64.) The male did not appear to Mr. Horiuchi to be armed and no shots were fired at this male. (WTT Tr. at 64-65.)

A few minutes after the male had been seen coming out the back door, Mr. Horiuchi heard a helicopter in the valley starting its engine. (WTT Tr. at 65.) Mr. Horiuchi saw the helicopter lift off and disappear behind the trees. (WTT Tr. at 66.) Within five to ten seconds of the helicopter's engine cranking over, three individuals ran out of the front door of the cabin. (WTT Tr. at 65, 68, 70, 76.) The three individuals were two adult males and one young female (WTT Tr. at 68-69) who were later identified at trial as Sara Weaver, Randy Weaver and Kevin Harris. The men were dressed similarly in dark clothing. (WTT Tr. at 69.) Mr. Horiuchi saw through his 10 power scope on his rifle that one of the adult males was carrying a long weapon. (WTT Tr. at 69.) The weapon was being held in a "high port" carry, meaning up high near his chest. (WTT Tr. at 70-71.) The three individuals were moving initially towards the rock outcropping that had been described as the Weavers' lookout in the earlier briefings to the HRT.[7] (WTT Tr. at 85.) Mr. Horiuchi instructed his sniper partner, Mr. Monroe, to keep his eye on the front door[8] (WTT Tr. at 85.) and Mr. Horiuchi kept his sight on the three individuals who had run out of the cabin. In addition to the sound of the helicopter, Mr. Horiuchi could hear the Weavers' dogs were barking and vehicles running in the command post. (WTT Tr. at 71.)

The three individuals were in Mr. Horiuchi's field of vision for approximately three to five seconds heading from the front cabin door towards the rock outcropping. They then disappeared from Mr. Horiuchi's view, but returned to his view for another three to five seconds beyond the rock outcropping. (WTT Tr. at 75.) Next, Mr. Horiuchi saw one adult

---

[7] Intelligence briefings were that "whenever a vehicle or some noise disturbed the dogs or they heard a vehicle or somebody moving up towards their house, Mr. Weaver would send out one of his children towards the rock outcropping. . . ." (WTT Tr. at 210.)

[8] The Court notes that it does not have any trial testimony or an affidavit from Mr. Monroe regarding what he saw when he was watching the front door of the residence.

**ORDER** - Page 5
98ORDERS\HORIUCH.DIS

male come around the back end of the birthing shed and appeared to be looking up in the sky. (WTT Tr. at 80.) Mr. Horiuchi thought that the individual was looking at the helicopter which Mr. Horiuchi believed to be behind and above his position based upon the sound of the helicopter. (WTT Tr. at 80.) Mr. Horiuchi thought the individual was Mr. Harris, but in fact was later determined to be Mr. Weaver.

Before Mr. Horiuchi could get his scope on the individual, the adult male moved around the corner and out of sight. (WTT Tr. at 81.) Within a few seconds, the same individual came back around the corner of the birthing shed and this time the weapon was at "high port" and the individual appeared to Mr. Horiuchi to be scanning the area that appeared to be above and behind Mr. Horiuchi's position. (WTT Tr. at 85, 87-90.) Mr. Horiuchi believed the individual was looking for the helicopter. (WTT Tr. at 87-88.) Mr. Horiuchi testified that he thought the armed male would perhaps take a shot at the helicopter from behind the birthing shed (WTT Tr. at 87-88.) and to prevent injury to the helicopter occupants, he fired at the armed male (he thought was Mr. Harris). (WTT Tr. at 90, 256.) At the moment of firing, the person went in a direction opposite of that expected by Mr. Horiuchi (WTT Tr. at 97-98.) and based on the individual's reaction to the shot, Mr. Horiuchi assumed he had missed. (WTT Tr. at 91, 101.)

Within seconds of Mr. Horiuchi firing the shot at the adult male near the birthing shed, the same three individuals were seen running from behind the birthing shed towards the cabin. (WTT Tr. at 99.) One male and the female appeared to running together and the other male seen by Mr. Horiuchi to be carrying the rifle (Mr. Harris) was approximately 10 yards behind the other two persons.[9] (WTT Tr. at 99, 190.) The first two individuals immediately disappeared through the open doorway. (WTT Tr. at 105.)

Mr. Horiuchi testified that he determined in a matter of a split second that he would shoot again to kill if possible and prevent the third individual carrying the rifle from taking

---

[9] Mr. Horiuchi originally testified Mr. Harris was 9 or 10 feet behind Mr. Randy Weaver and Ms. Sara Weaver, but on cross-examination it was clarified that when he said 9 or 10 paces he meant 9 to 10 yards (not feet) behind the two individuals running towards the cabin.

**ORDER** - Page 6
98ORDERS\HORIUCH.DIS

up a defensive position in the house (where the armed male could shoot, but the HRT members could not because of the children). (WTT Tr. at 106-107.)

At approximately 6:00 p.m., Mr. Horiuchi, at approximately 200 to 300 yards from the cabin placed the appropriate mildot in the scope on the third individual running towards the open cabin door, so as to allow for the movement of the individual and fired as such individual was taking his last leap to get into the doorway. (WTT Tr. at 33, 107-109.) Mr. Horiuchi testified that the third individual was running at a high rate of speed, slowed down, paused and then quickly continued through the door. (WTT Tr. at 269-70, 280.) Specifically, Mr. Horiuchi's testified that, "He [Mr. Harris] had taken his weapon in his right hand and he was reaching out with his left hand. It appeared to me like he was trying to hold the door open or moving somebody out of the way, and that's the time I shot." (WTT Tr. at 108.) Mr. Horiuchi was not aiming at the door, he was aiming at the moving target of Mr. Harris. (WTT Tr. at 285.)

The bullet fired by Mr. Horiuchi, unfortunately, hit and killed Vicki Weaver. The same bullet, after exiting the body of Mrs. Weaver, also hit and seriously injured the third individual who was running for the cabin, Mr. Harris.

Mr. Horiuchi testified in the previous trial that he was not able to see through the door (WTT Tr. at 277, 281, 283); he did not know if someone was or was not behind the door (WTT Tr. at 243-244, 283); he never saw Vicki Weaver and that he did not intend to hit or kill anyone other than the third person running for the cabin who was carrying the long rifle. (WTT Tr. at 246- 247, 347.)

The front cabin door opens out. (PH Tr. at 53.) The bullet went through the lower right-hand pane of glass on the top half of the cabin's front door. (WTT Tr. at 126.) The top half of the door was glass with six divided panes. (PH Tr. at 20, WTT Tr. at 109-110.) It is disputed whether the curtains over the glass portion of the door were open or closed at the time of the shot by Mr. Horiuchi. Sara Weaver testified at the Preliminary Hearing that the dark denim curtains were always tied back and were never closed. (PH Tr. at 23.) However, the bullet hole through the glass only lines up with the bullet hole in the curtains if the curtains are hanging down (instead of being pulled back). (WTT Tr. at 282.)

ORDER - Page 7
98ORDERS\HORIUCH.DIS

It is also disputed as to where exactly Mrs. Weaver was standing right before and when the fatal shot was fired. Mr. Weaver and Sara Weaver testified they did not see the bullet hit Mrs. Weaver. Randy Weaver testified at the Preliminary Hearing that Mrs. Weaver had been standing three or four feet beyond the porch holding the baby just after he was shot at the birthing shed, but that he had not seen her until he had been shot. When questioned regarding Mrs. Weaver's location when she was shot, Mr. Weaver testified that, "She came out of the house with the baby -- she might have been on the porch. I don't know, to be honest with you. I know that she had the baby when she hollered at me and she was holding the baby when we went through the door." (emphasis added) (PH Tr. at 92.)

Sara Weaver testified at the Preliminary Hearing that her mother was holding the door open as Sara, Mr. Weaver and Mr. Harris were running for the door. (PH Tr. at 17.) During direct examination, Sara testified that her mother was standing in front of the doorway. (PH Tr. at 17.) However, in cross-examination, she clarified her earlier testimony and stated that she never saw her mother actually come beyond the doorway and does not remember if Mrs. Weaver was outside the threshold of the door.[10] (PH Tr. at 51.)

## ANALYSIS

The issue before this Court is whether or not, pursuant to a 12(b)[11] motion filed by and on behalf of Mr. Horiuchi, this Court can determine that Defendant Lon Horiuchi is entitled to have the state's prosecution of him on the charges of involuntary manslaughter dismissed

---

[10]Testimony of Sara Weaver at Preliminary Hearing, p. 51:
Question: Is it your testimony that your mother - - did your mother, did you ever see your mother actually come beyond the doorway?
Answer: No.
Question: Did you ever see her ever come as far as the doorway itself or was she inside?
Answer: I don't remember.

[11]Fed. R. Crim. P. 12(b) states in part:

Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.

based upon immunity under the Supremacy Clause of the United States Constitution pursuant to In re Neagle, 135 U.S. 1 (1890), wherein the Supreme Court in Neagle held that a federal officer cannot be held on a state criminal charge where the alleged crime arose during the performance of his federal duties.

### A. Is the Immunity Defense a Proper Motion to Be Determined Pretrial?

In Kentucky v. Long, 837 F.2d 727(6th Cir. 1987), the court determined that the Supremacy Clause of the United States Constitution requires that a state's indictment of a federal agent be dismissed before trial, absent an affirmative showing by the state that facts are in dispute as to whether the agent committed the alleged crime within the necessary and proper scope of federal duties. The court stated the reason the federal immunity defense should be decided as a Rule 12(b) motion was to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the issue decided.

The Court agrees with the analysis in Kentucky v. Long that a Supremacy Clause immunity defense is properly raised as a Rule 12(b) motion. Additionally, the Court has not discovered any case in which a trial court has deferred ruling on a defense of immunity under the Supremacy Clause until after all of the evidence was presented to the jury or left the issue for resolution by a jury.[12]

This Court, by reason of Rule 12(b) of the Fed. R. Crim. P., In re Neagle and its progeny is mandated to determine early on whether or not the record supports Mr. Horiuchi's and the United States Government's theory that his actions were necessary and proper, separate and apart from what might later be jury issues concerning reckless, careless or negligent operation of a firearm as charged in the Information. Finally, the Court finds that the factual record of this matter is complete for purposes of determining if the Supremacy Clause immunity defense as defined by Neagle and its progeny of cases applies.

---

[12]The fact that most cases reviewed involved writs of habeas corpus instead of Rule 12(b) motions can be explained by the age of cases (Neagle is an 1890 case) and the fact that the removal statute allowing a federal officer to remove his/her case to federal court did not exist prior to the enactment of 28 U.S.C. § 1442 in 1948.

**ORDER** - Page 9
98ORDERS\HORIUCH.DIS

B.  Two Part Test for Immunity Defense.

The Supreme Court has recognized that the Supremacy Clause of the United States Constitution protects federal officers from state prosecution for authorized conduct in the course of such officer's official duties. In Neagle, the Supreme Court articulated the two-part test for federal officer immunity:

    1) the federal officer was performing an act which such officer was authorized to do by the law of the United States and which it was his duty to do; and

    2) in performing the act, the federal officer did not more than what was necessary and proper for him to do.

Neagle, 135 U.S. 1, 75 (1890), Clifton v. Cox, 549 F.2d 722, 725 (9th Cir. 1977).

The State argues that the necessary and proper language necessarily requires a jury trial and findings of fact to be made by the fact finder. The case law is to the contrary and the initial test is whether the officer (not third parties) had an honest belief that his actions were within the scope of his duties and were reasonable. "It is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official." Scherer v. Morrow, 401 F.2d 204, 205 (7th Cir. 1968), cert. denied, 393 U.S. 1084 (1969). Therefore, the second part of the test is not whether the ultimate result of Mrs. Weaver's death was necessary and proper. Clearly, the deaths of Deputy Marshal Degan, Sammy Weaver and Mrs. Weaver were not "necessary and proper" when the common definitions of the words "necessary and proper" are applied. But as established by the case law, the "necessary and proper" part of the test is whether the officer had an honest belief that the act was necessary to the performance of his duty and whether the officer acted in a way that the officer could consider reasonable under all the circumstances.

C.  Was Mr. Horiuchi Acting Within Scope of His Federal Duties at the Time of the Shooting?

The first part of the Supremacy Clause immunity defense is was Mr. Horiuchi's presence and actions on Ruby Ridge on August 22, 1992 in the performance of his duties as

ORDER - Page 10
98ORDERS\HORIUCH.DIS

a FBI HRT member. This finding has basically been conceded by the State and this Court has already determined in its Order of January 24, 1998 (Docket No. 24), that Mr. Horiuchi was acting within the scope of his duties at the time of the shooting of Mrs. Weaver. Additionally, the Declaration of Roger Wheeler sets forth that the Defendant was acting within the scope of his employment with the FBI and this evidence is unrefuted by the State.

### D. Were Mr. Horiuchi's Actions as a Federal Agent "Necessary and Proper?"

Both the Neagle and Clifton cases require that in performing the act alleged to be criminal the federal officer did no more than what was "necessary and proper" for the officer to do in the performance of his/her duties. The significant question in determining whether or not Mr. Horiuchi's conduct was necessary and proper under the circumstances then existing is the question of whether he employed means which he could not honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some criminal intent. Clifton v. Cox, 549 F. 2d 722, 728 (9th Cir. 1977)(citing In re McShane, 235 F. Supp. 262, 273 (N.D. Miss. 1964)). The express language of the Information rules out the issue of malice or criminal intent in this case. Moreover, the State has not offered any evidence of malice or criminal intent on the part of Mr. Horiuchi.

In Clifton, the Ninth Circuit held that the proper application of the "necessary and proper" standard does not require the defendant to show that his action was in fact necessary or in retrospect justifiable, only that he thought it to be. Id. at 728. In other words, errors in judgment alone do not create criminal responsibility for a federal officer acting within the scope of his employment. Whether or not the action taken by Mr. Horiuchi was in fact necessary or in retrospect justifiable is not relevant in the absence of malice or criminal intent. In Clifton, the court adopted the holdings from two earlier decisions regarding federal officers and stated that "[N]otwithstanding the questionable legality of a federal officer's actions, the courts recognized the general rule that errors of judgment in what one conceives to be his legal duty will not alone serve to create criminal responsibility of a federal officer." Id. at 727 (citing to the decisions In re Fair, 110 F. 149 (D. Neb. 1900) and In re Lewis, 83 F. 159 (D. Wash. 1897)).

**ORDER - Page 11**
98ORDERS\HORIUCH.DIS

Additionally, the court in <u>Clifton</u> held that in determining whether the shooting by a federal officer was necessary and reasonable rests not only on the objective finding that his conduct may be said to be reasonable under the existing circumstances, but also on the subjective belief of the officer. <u>Id.</u>

1. <u>Subjective Belief of Officer Under Existing Circumstances.</u>

The record is void of any evidence that refutes Mr. Horiuchi's subjective belief that in his mind, the third individual running back into the cabin with a rifle created an additional risk if he made it to the cabin; that in his briefings he was advised that the occupants were heavily armed and that all members (including the children) were seen from time to time carrying weapons; that his orders were clear and specific to shoot any adult male carrying a firearm, particularly if seen to be taking or believed to be taking aggressive action; that the shot fired was intended to kill the third individual running towards the cabin and no one else; and that he did not see Vicki Weaver behind the door or in the doorway when he fired.

For purposes of the 12(b) motion to dismiss, the Court finds that Mr. Horiuchi honestly believed, rightfully or wrongfully, that the intentional shooting of Mr. Harris was necessary and proper based upon the existing circumstances at Ruby Ridge on August 22, 1992.

2. <u>Objective Analysis of Means Employed by Officer Under Existing Circumstances.</u>

In deciding the second step of necessary and proper analysis, whether the record before the Court satisfies the objective finding that his conduct was reasonable under the circumstances then existing, the State has not carried its burden of presenting an affirmative showing that Mr. Horiuchi acted in bad faith or that Mr. Horiuchi acted in a way that cannot be considered reasonable by Mr. Horiuchi under all of the existing circumstances.

The State contends that the testimony of Randy Weaver and Sara Weaver as to the location of Vicki Weaver at the time of the shooting creates conflicting evidence and issues of fact that cannot be decided by this Court, but are for the jury. These alleged disputed

facts, however, are not inconsistent or necessarily at odds with Mr. Horiuchi's testimony that he did not see Mrs. Weaver. Mr. Weaver saw Mrs. Weaver some three to four feet beyond the porch at a time when Mr. Weaver was at the birthing shed which was some distance from the cabin. However, Mr. Horiuchi testified that he was looking in the direction of the birthing shed and not the porch because of the actions taken by one of the three individuals (who came outside the cabin together) which Mr. Horiuchi interpreted as hostile. Mr. Horiuchi was trying to prevent a shot from being taken at helicopter when he fired the shot at the armed man at the birthing shed. By the time Mr. Weaver was at or near the front of the cabin, Mr. Weaver does not remember where exactly Mrs. Weaver was standing. ("I don't know, to be honest with you.") (PH Tr. at 92.)

Sara Weaver's testimony might be construed to be inconsistent with her father's at one point in time, but not with Mr. Horiuchi's. Sara never saw her mother actually come beyond the doorway and does not remember if Mrs. Weaver was outside the threshold of the door when Sara, Mr. Weaver and Mr. Harris were running towards the cabin. ("Question: [D]id you ever see your mother actually come beyond the doorway? Answer: No.") ( PH Tr. 51.)

It is this Court's finding that the testimony of Mr. Weaver and Ms. Weaver fails to provide any clear evidence of where Vicki Weaver was standing at the time of the shooting. The testimony of Mr. Weaver and Sara Weaver in no way establishes that Mr. Horiuchi could see Mrs. Weaver when he fired at Mr. Harris. The testimony of Mr. Weaver indicates Mrs. Weaver was on or beyond the porch when Mr. Weaver was shot at the birthing shed, but neither of the Weavers are sure whether Mrs. Weaver was beyond the doorway or threshold of the door when they were running back into the cabin.[13]

---

[13]In the State's Corrected Rule 28(J) Analog Submission in Further Opposition to Defendant's Motion to Dismiss (Docket No. 55), the State argues by alterations via a parenthetical clause to Sara Weaver's testimony that Mrs. Weaver [was in front of the doorway, and therefore, on the porch, outside the house.] The State's alterations to the transcript are not supported by the record when the direct and cross-examination are read within their proper context. Sara Weaver never testified at the time of the fatal shooting that her mother was on the porch. More importantly, even if Mrs. Weaver was just beyond the threshold of the door, Sara never testified that Mrs. Weaver could have been or was seen by Mr. Horiuchi.

**ORDER** - Page 13
98ORDERS\HORIUCH.DIS

Further, the resolution of any alleged factual conflicts by the Weavers and Mr. Horiuchi is not determinative of whether the Supremacy Clause immunity defense applies. The question of what others might have seen or understood is immaterial to the resolution of the ultimate issue of whether Mr. Horiuchi employed means which he could consider reasonable in the discharge of his duty. Arguably, the Preliminary Hearing testimony of Rick Alonzo is somewhat relevant to the inquiry of whether Mr. Horiuchi employed means which he could consider reasonable in the discharge of his duty. However, Mr. Alonzo's background as a firearms instructor and local law enforcement officer is not directly similar to Mr. Horiuchi's training as an FBI sniper observer/team leader. Further, Mr. Alonzo testified that other than what he read in the papers, he knew nothing about the specifics of the shooting of Mrs. Weaver. Accordingly, the State failed to provide relevant evidence to the Court that Mr. Horiuchi's means of performing his duties on the day of the shooting were objectively unreasonable.

The State cites Mr. Horiuchi's own testimony,[14] and argues that Mr. Horiuchi knew or should have known that Mrs. Weaver was behind the door and that Mr. Harris was moving Mrs. Weaver out of the way when he fired the shot. While Mr. Horiuchi's statement is not a model of clarity and is subject to speculation at best, even if one assumes that Mr. Harris was moving somebody out of the way, the Court finds that it would be objectively reasonable for Mr. Horiuchi to believe that one would not expect a mother to place herself and her baby behind an open door outside the cabin after a shot had been fired and her husband had called out that he had been hit. The fact that all parties, including Mrs. Weaver, were armed and the haste with which the other two people entered the cabin ahead of Mr. Harris physically demonstrated the hostility of the situation. Moreover, the relevant question for purposes of the immunity defense is not what Mr. Harris was doing as he ran through the door, but what Mr. Horiuchi saw. Mr. Horiuchi's testimony that he did not see Mrs. Weaver is not refuted.

---

[14]"He [Mr. Harris] had taken his weapon in his right hand and he was reaching out with his left hand. It appeared to me like he was trying to hold the door open or moving somebody out of the way, and that's the time I shot." (WTT Tr. At 108.)

ORDER - Page 14
98ORDERS\HORIUCH.DIS

Counsel for the State argues that it is inherently subjectively and objectively unreasonable to fire at a woman on a porch holding a baby. The Court agrees that if the only facts before the Court were that Mrs. Weaver was clearly visible and was standing on the porch holding a baby, Mr. Horiuchi's firing of the shot would not have been reasonable. However, the relevant facts before this Court for purposes of applying the immunity defense are that Mr. Horiuchi did not see Mrs. Weaver on the porch and that he could not see anyone behind the open door. There is only conflicting evidence as to whether she was behind the door or in the doorway when Mr. Weaver, Ms. Weaver and Mr. Harris were running for the cabin and the fatal shot was fired. Finally, Mr. Horiuchi's decision to shoot to kill Mr. Harris was a split second decision in a crisis situation.

The Court finds that the present record before this Court supports a finding that under the existing circumstances, Mr. Horiuchi's conduct was objectively reasonable:

1) Defendant had no motive other than to discharge his duty as a federal officer.

2) His actions were being observed and scrutinized by his fellow team members and he reported his actions immediately to his supervisors. Nothing in Mr. Horiuchi's report and there is no evidence from any other reports or observations that anyone was aware Mrs. Weaver had been hit, injured or killed until a much later time.

3) Mr. Horiuchi's decision to shoot to kill Kevin Harris was within the Rules of Engagement approved by his supervisors. Based on his specialized training, Mr. Horiuchi was given the discretion as to how to carry out his responsibilities so long as he was not shooting into the cabin or injuring small children that he could reasonably be aware of. The shot was fired perpendicular to the front of the house and not "into" the house.[15] If the door had not been opened and Mr. Horiuchi had missed hitting Mr. Harris, the

---

[15] Mr. Horiuchi testified he did not consider his shot to be "into" the house. (WTT TR. 120.)

**ORDER** - Page 15
98ORDERS\HORIUCH.DIS

        second shot by Mr. Horiuchi would have continued the length of the porch and would have struck an object south of the cabin.[16] (WTT TR. 120.)

4) That Mr. Horiuchi's explanation of why he exercised his discretion to shoot to kill the third individual rather than let him reach the defensive cover of the cabin has to be viewed in light of the facts known to him to be in existence at that time, i.e., that the three individuals knew then that a shot had been taken by the HRT and that this was a life and death situation. Mr. Horiuchi knew that a federal officer had previously been shot and killed allegedly by one or more of persons in the cabin so that aggressive and threatening action could and likely would be taken by them if they were in a position to do so.

5) That under the circumstances in this case Mr. Horiuchi, rightfully or wrongfully, was clearly acting under orders authorized by the United States Government to shoot and kill an armed male adult because the threat to human lives had already been determined by his supervisors based on the facts then known to them.

E. <u>Conclusion.</u>

        One of the basic tenets in the application of the Supremacy Clause is that the states have no power to determine the extent of federal authority. The rationale for the immunity defense policy is that a federal officer acting within the scope of his/her employment and pursuant to direct orders from his/her supervisors needs to know with some degree of certainty the law to which he/she is going to be governed by. It is unrealistic to believe that the Supremacy law of the U.S. Constitution could be interpreted to suggest that a federal law enforcement officer could be ordered into a crisis situation and then have the reasonableness of his/her actions decided by a different governmental authority. Yet at the same time the Court recognizes that invoking the Supremacy Clause should be done with great caution and only where justified by the facts.

---

[16] The second shot by Mr. Horiuchi entered at approximately a 90 degree angle through the door. (WTT Tr. at 267.)

**ORDER - Page 16**
98ORDERS\HORIUCH.DIS

Based upon the record in this matter, the Court finds that Mr. Horiuchi was acting within the scope of his federal authority and that he employed means which he could honestly consider reasonable in discharging his duties on August 22, 1992, and that the motion to dismiss based upon the immunity clause of the Supremacy Clause of the U.S. Constitution should be granted. The actions of Mr. Horiuchi had tragic results. However, Mr. Horiuchi did no more that what was "necessary and proper" for him to do to carry out his duties under the totality of the circumstances as known to Mr. Horiuchi on August 22, 1992 as defined by Neagle and its progeny of cases. The record supports Mr. Horiuchi's subjective belief that the threat to his or other lives honestly existed; that he intended only to shoot the third individual (Mr. Harris); and that the State has provided no evidence of malice or criminal intent. The record also supports a finding that the means by which Mr. Horiuchi carried out his duties were objectively reasonable based on the circumstances then existing at Ruby Ridge on August 22, 1992, and that he did not see Mrs. Weaver behind the door or in the doorway when he fired at Mr. Harris running into the cabin.

Accordingly, the Defendant's Motion to Dismiss Based on the Supremacy Clause of the United States Constitution is granted and the case is dismissed. The fact that this Court has ruled that the State is barred from prosecuting Mr. Horiuchi for involuntary manslaughter based on the Supremacy Clause of the U.S. Constitution is not to be construed as a finding by this Court as to whether or not Mr. Horiuchi should be charged with a federal crime. Nor is the Court's ruling on the motion to dismiss a factual finding by this Court of Mr. Horiuchi's innocence or guilt. Whether or not Mr. Horiuchi or his superiors who established the Rules of Engagement in effect at the time should be prosecuted for any offense in federal court is not before this Court and this Court reserves judgment on the same.

Finally, because the Court finds that the Defendant's motion is dispositive of the case, the Court need not set forth its analysis of the State's motion regarding the issue of qualified immunity and the same is denied without prejudice.

## ORDER

Being fully advised in the premises, the Court hereby orders that:

1. Motion of Amici Curiae Hon. William P. Barr. Hon. Griffin B. Bell, Hon. Benjamin R. Civiletti, Hon. Richard L. Thornburgh and Hon. William H. Webster for Leave to File Memorandum in Support of Defendant (Docket No. 41) is **DENIED** as such was not timely filed.

2. Motion for Leave to File Amicus Curiae by the International Association of Chiefs of Police, Inc. (Docket No. 48) is **DENIED** as such was not timely filed.

3. Motion by USA for Leave to File Amicus Curiae Brief (Docket No. 48) is **GRANTED** as this motion and related memorandum was timely filed and the United States has a definable interest in this case.

4. Motion by Defendant to Strike the State's Post-Hearing Supplemental Brief (Docket No. 57) is **GRANTED**. The State's brief was filed without leave of the Court and should have been filed prior to the hearing on the Defendant's Motion.

5. Motion by Defendant to Transfer Division and to Change Venue (Docket No. 33-1 and 33-2) is **DENIED**.

6. Motion by Defendant to Dismiss Based on Immunity under the Supremacy Clause (Docket No. 31) is **GRANTED**. The pending charges in the Information and Criminal Complaint against the Defendant are **DISMISSED WITH PREJUDICE**.

7. Motion by State to Disallow [Qualified] Immunity Defense (Docket No. 33) is **DENIED WITHOUT PREJUDICE** based upon the Court's dispositive ruling on the Defendant's Motion to Dismiss.

8. Based upon the dismissal of the pending charges, the Court will not grant the Application for Admission Pro Hac Vice of Joseph Reichmann. Such Application may be filed with the Ninth Circuit Court of Appeals should the judgment of this Court be appealed.

Dated this 14th day of May, 1998.

EDWARD J. LODGE
UNITED STATES DISTRICT JUDGE

District of Idaho
May 14, 1998

## * * CLERK'S CERTIFICATE OF MAILING * *

Re:  3:97-cr-00097

I certify that a copy of the attached document was mailed to the following named persons:

Denise M Woodbury, Esq.
PO Box 1107
Bonners Ferry, ID  83805

Stephen Yagman, Esq.
YAGMAN & YAGMAN
723 Ocean Front Walk
Venice, CA  90291-3270

Robert Huntley, Esq.
GIVENS PURSLEY & HUNTLEY
PO Box 2720
Boise, ID  83701

Patrick J Miller, Esq.
GIVENS PURSLEY & HUNTLEY
PO Box 2720
Boise, ID  83701

Adam S Hoffinger, Esq.
SCHWALB DONNENFELD & SILBERT
1025 Thomas Jefferson St NW
#300 East
Washington, DC  20007-5207

Patrick P de Gravelles, Esq.
SCHWALB DONNENFELD & SILBERT
1025 Thomas Jefferson St NW
#300 East
Washington, DC  20007-5207

Patricia L Maher, Esq.
SCHWALB DONNENFELD & SILBERT
1025 Thomas Jefferson St NW
#300 East
Washington, DC  20007-5207

Earl J Silbert, Esq.
SCHWALB DONNENFELD & SILBERT
1025 Thomas Jefferson St NW
#300 East
Washington, DC  20007-5207

Cameron S. Burke, Clerk

Date: 5/14/98

BY: *SButler*
(Deputy Clerk)